UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 8:17-cr-283-T-24JSS

BRANDON CLINT RUSSELL

**UNITED STATES' AMENDED MOTION FOR
AN ORDER REVOKING DEFENDANT'S RELEASE**

The United States respectfully moves this Court, pursuant to 18 U.S.C.

§ 3145(a)(1), to review the order granting Brandon Clint Russell's release

(Doc. 18), revoke that order, and detain Russell pending trial. Further, the

government requests that this Court stay the release order as may be necessary

for this Court's consideration of this motion.

## I.    Background and Procedural History

Around 5:30 p.m. on Friday, May 19, 2017, 18-year old Devon Arthurs

walked into a smoke shop in Tampa Palms wielding a gun and told employees

that he had just killed two people.  After Tampa Police Department Officers

arrived and took him into custody, Arthurs led them to an apartment leased by

Russell and told officers where to find the bodies of 22-year old J.H. and 18-

year old A.O.  Arthurs had shot and killed two of his roommates for allegedly

disrespecting and teasing him over his recent conversion to Islam.

Upon arriving at the scene, officers encountered Russell, Arthurs' other roommate and longtime friend, standing outside the apartment in his Army National Guard uniform. Russell had returned home from his Reserve duties and was visibly upset after having found the victims' bodies. Arthurs told police that Russell knew nothing about the murders.

Post-*Miranda*, Arthurs told officers that he, Russell, and the two victims had shared a common neo-Nazi belief until Arthurs recently converted to Islam. Arthurs advised that Russell and the victims were active members of the "Atom Waffen" group, a neo-Nazi group started and led by Russell. Arthurs informed officers that he had seen Russell online in various neo-Nazi chat rooms, where Russell threatened to kill people and bomb infrastructure. Arthurs further advised that Russell had materials in the house to kill civilians and target locations like power lines, nuclear reactors, and synagogues.

A state-court authorized search warrant was executed at the apartment. In the garage, agents found a cooler containing a white cake-like substance that two FBI and TPD bomb technicians immediately recognized through their training and experience as the highly volatile explosive Hexamethylene Triperoxide Diamine (HMTD).  Within a short distance of the HMTD were explosive precursors such as potassium chlorate, potassium nitrate, several pounds of ammonium nitrate (a blasting agent that was in a package

addressed to Russell), nitro methane, hexamine, and citric acid.  Also within a short distance of the HMTD were empty 5.56 caliber shell casings with fuses and electric matches, both of which could be used to detonate a destructive device.

In Russell's bedroom, officers found neo-Nazi and white supremacist propaganda, including a framed picture of Timothy McVeigh on his dresser, firearms, and ammunition. In the second bedroom, where the victims had been living and were found, officers found a blue duffel bag in the closet containing hobby-like fuses like the ones found in the empty 5.56 caliber ammunition casings in the garage, a written recipe for explosives, petroleum jelly, and five recordable compact discs.

The night of the murders, Russell voluntarily spoke with law enforcement.  He admitted to making the HMTD found in the garage. He claimed that he had been a member of an engineering club at the University of South Florida and that the HMTD was for setting off model rockets and balloons.  (Notably, officers found nothing in the apartment related to model rockets).  Russell stated he had made the HMTD over a year ago but had not gotten rid of it. He admitted to the possession of the ammonium nitrate and other precursors found in the garage, as well as the electric matches that could be used as an initiator.  Russell told officers that he just wanted to go to West

Palm Beach to see his father.

United States Magistrate Judge Thomas B. McCoun III authorized a criminal complaint for Russell's arrest on May 20, 2017, charging him with possession of an unregistered destructive device and the unlawful storage of explosive material, in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 842(j), respectively.  By then, Russell had left the Tampa area, but had not gone to see his father as he had told law enforcement.  His family advised law enforcement that they either had not heard from him or did not know his whereabouts.

The following morning, the Monroe County Sheriff's Office arrested Russell while he was inside a restaurant in Key Largo.  FBI agents took Russell into custody and advised him of his rights.  Russell described coming home and finding his roommates murdered. Russell advised that he had been friends with the victims for about a year. He stated that he and Arthurs had known each other for about three or four years and had met in an online chat room.  When asked what the chat room was about, Russell described it as "about world events" and said that the United States is not the only place that matters in the world.

When asked if there were any homemade explosives in the apartment, Russell nodded. Russell stated that the explosives were used for amateur

rockets, which he launched from a field.  He admitted to having two guns and ammunition in his car.  When asked what he knew of the words "Atom Waffen," Russell ended the interview.

In Russell's vehicle, agents found two rifles in the original manufacturer's boxes: (1) a Savage Arms, 30-06 caliber rifle, and (2) a Smith & Wesson M&P Sport II, 5.56 caliber assault-style rifle. Russell also had two cases of .223 caliber ammunition (about 500 rounds), three boxes of 30-06 caliber ammunition, and four 5.56 x 45 mm, 30-round magazines. Each of the four magazines was already loaded with about 25 rounds of the .223 caliber ammunition.  Russell also had binoculars, some of his Army camouflage uniforms, combat boots, and a skull mask.

Another individual was with Russell at the time of his arrest and voluntarily spoke with law enforcement.  A self-proclaimed fascist, neo-Nazi, and national socialist, this person described meeting Russell online in the forum "Iron March," where individuals discuss fascism, Nazism, and "current trends" in hate for the government. This individual said that he and Russell shared common viewpoints and that Russell was one of his best friends. The friend stated that Russell had multiple firearms and that they would go to gun shops and gun ranges together. Russell's friend knew Arthurs and the victims, and had planned to move in with the four of them.  This friend described

"Atom Waffen" as a more exclusive group than Iron March, with approximately thirty members from across the United States.  According to Russell's friend, Russell screened members who wanted to join "Atom Waffen," because they did not want people to join who were not committed to their beliefs or who were "complete idiots."

Russell's friend advised that early on May 20, Russell had arrived at the friend's house in his military uniform.[1] Russell told his friend about the murders and said that he wanted to get away and clear his head. Russell's friend grabbed clothes, his life savings of $3,000, and quit his job on the way out of town. Russell's friend told agents that he thought he might not return home.  He thought that he and Russell were initially going to Russell's father's house in West Palm Beach, but as they got closer Russell changed his mind because he thought law enforcement might be looking for him.  According to Russell's friend, they had no specific destination in mind and had no plans to hurt anyone or do any harm. As they traveled south, the pair stopped at a sporting goods store where Russell purchased the firearms and ammunition (allegedly for self-defense).

---

[1] Contrary to the statement in the court's order of release that Russell connected with this individual in Homestead, this individual lived in Bradenton.  Russell went to this individual's residence early on the morning of May 20 after leaving law enforcement, and they proceeded to South Florida together.

Following his arrest, Russell made his initial appearance in the Southern District of Florida on May 22, 2017, during which he waived removal and reserved on the issues of a preliminary hearing and bond pending his transfer to Tampa.  On May 31, 2017, Russell moved this Court to set a bond hearing.  (Doc. 8)  On June 7, 2017, a grand jury in the Middle District of Florida, Tampa Division, indicted Russell for possessing an unregistered destructive device, in violation of 26 U.S.C. § 5861(d), and the unlawful storage of explosive material, in violation of 18 U.S.C. § 842(j). (Doc. 14) Count One carries a maximum penalty of ten years' of imprisonment, and Count Two carries a penalty of one year imprisonment.   Magistrate Judge McCoun considered the matter of detention at a hearing on June 8, 2017. (Doc. 15)

At the detention hearing, the United States moved for the defendant's pretrial detention pursuant to 18 U.S.C. § 3142(e)(1).  Most of the facts above were proffered by the government, and the defendant offered that he posed no harm and could be released to his grandmother on a secured bond.  He further claimed that the rifles and ammunition he purchased on May 20, 2017, could be used for hunting.  At the conclusion of the hearing, the court took the matter under advisement.  On June 9, 2017, the court entered an order granting Russell's motion for bond, but has not yet entered an order setting

conditions of release.  (Doc. 18).  Pursuant to 18 U.S.C. § 3145(a)(1), the

United States now seeks an order from this Court revoking Russell's release.

Further, the government requests that this Court stay the release order as

necessary for this Court's consideration of this motion.

## II.   Standard of Review

The release order is subject to plenary review by this Court.  As a result,

the Court must undertake an independent review of the case, enter its own

findings in writing, and set forth the reasons supporting its decision.  *See United

States v. Hurtado*, 779 F.2d 1467, 1480-81 (11th Cir. 1985) (citing, *inter alia*,

*United States v. Beesley*, 601 F. Supp. 82, 83 (N.D. Ga. 1984)).  This

"independent review" has been characterized as a "*de novo* review."  *See United

States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) ("In *Hurtado*, we held that

*de novo* review requires the court to exercise independent consideration of all

facts properly before it and to include written findings of fact and a written

statement of the reasons for the detention.").

Notably, *de novo* review does not require this Court to hold a *de novo*

hearing, as long as the Court exercises independent consideration of all the

facts properly before it.  *Id.; United States v. King*, 849 F.2d 485, 489-90 (11th

Cir. 1988) (discussing *Hurtado* and *Gaviria*).  Moreover, this Court is entitled to

base its *de novo* review on proffered evidence rather than sworn testimony.

*Gaviria*, 828 F.2d at 670 (finding no error where district court based its *de novo* review of detention order on the parties' memoranda of law and a transcript of the proceedings before the magistrate judge, in which both parties proffered evidence instead of presenting sworn testimony). *Cf. id.* at 669 (holding that "the government as well as the defense may proceed by proffering evidence subject to the discretion of the judicial officer presiding at the detention hearing" and observing that the legislative history of the Bail Reform Act indicates that Congress anticipated that "the use of sworn testimony [would] be the exception and not the rule").

## III.   Argument

Under the Bail Reform Act, a defendant shall be released pending trial unless a judicial officer determines that release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.  18 U.S.C. § 3142(c).  Moreover, "the lack of reasonable assurance of *either* the defendant's appearance *or* the safety of others or the community is sufficient; both are not required." *United States v. Fortuna*, 769 F.2d 243, 249 (5th Cir. 1985) (citations omitted). Section 3142(g) provides a list of factors for the court to consider in making this determination. When viewed in light of the evidence and circumstances of this case, the factors set forth 18 U.S.C. § 3142(g) overwhelmingly resound in favor of

Russell's continued detention in order to both assure his appearance as required and ensure the safety of any other person and the community.

### A.    The Nature and Circumstances of the Offense

Because the offense charged in Count One of the Indictment involves an explosive or destructive device, this factor weighs heavily in favor of detention.  *See* 18 U.S.C. § 3142(g)(1) (specifically requiring the court to consider whether the offense involves an explosive or destructive device).  In the order granting release, the Magistrate Judge dramatically minimized this factor, noting simply that the government asserts that together, the components found in Russell's residence could be used to make a bomb.  (Doc. 18, at 1).  The court also seemed to discount this factor because the government cannot claim that Russell has used the material to harm anyone, even though the evidence points to that being Russell's intended purpose.  As noted above, nothing found in Russell's apartment supports his explanation that he used these materials merely to launch model rockets—to the contrary, the garage was barren of anything other than Russell's mini-lab to construct explosive devices.  Further, as set forth in the criminal complaint, agents with training and experience in explosives report that HMTD is too energetic and volatile for Russell's stated uses.  (Doc. 1, at 6, ¶ 11).  The HMTD combined with the amount of ammonium nitrate and nitro methane found in the garage

would constitute a "bomb" within the meaning of 26 U.S.C. § 5845(f)(1) and

(3).  Detonating this type of bomb could easily cause a vehicle to explode,

killing all of the occupants and causing grave damage within a large distance

around the explosion site.  Preliminary testing has confirmed that the

explosive material was in fact HMTD.

Further, the court should not have discounted Count Two, the unlawful

storage of explosives, in its analysis. Russell stored a highly volatile,

homemade explosive within feet of other bomb-making materials in a cooler

in his garage—directly under living speact and separated by unsuspecting

third-parties only by a single wall.  The regulations regarding the storage of

explosive materials exist to ensure safety.  Russell acted with complete

disregard for the dangerousness of these materials.

The court's analysis did not apply the proper weight to this factor,

particularly in light of the fact that law enforcement's search of Russell's

residence corroborated Arthurs' statements to police, and not Russell's.   The

Magistrate Judge minimized the seriousness of these offenses, which error is

sufficient basis alone to determine that Russell should be detained, contrary to

the court's finding. The nature and circumstance of the offense

overwhemlingly favors detention.

**B.      The Weight of the Evidence Against the Defendant**

Moreover, the strength of the evidence against Russell weighs heavily in favor of detention.  Russell admitted in two separate interviews that he made the HMTD found in his residence and that the precursors and other materials that could be used to make a bomb belonged to him.  The Magistrate Judge also erroneously discounted the other evidence of Russell's intent behind his possession of bomb-making materials—the neo-Nazi paraphernalia, the framed picture of Timothy McVeigh (in his military uniform), the same extremist book that influenced McVeigh and is known as a "bible" of extremists, and other firearms found in Russell's bedroom.  As the court noted, Russell does not dispute that he is the leader of a neo-Nazi group.  Moreover, the fact that Russell lied about going to see his father and was found in Key Largo with more firearms and ammunition that he purchased less than 24 hours after being interviewed by the FBI shows consciousness of guilt.  Essentially, Russell created false cover stories about what the HMTD was for, where he was going, and what his intentions were.

In sum, the United States' proffered evidence against Russell is strong and weighs heavily in favor of detention.

**C.     The History and Characteristics of the Defendant**

Russell's actions in this case show him to be someone with personal characteristics that enhance his danger to the community.  Russel admitted the HMTD using commonly available ingredients and has the knowledge and ability to do so again if released.

Further, in the aftermath of two of his friends and roommates being murdered by his longtime friend, Russell's primary concern was not the victims of the shooting or cooperating with law enforcement, but rather leaving town with another self-proclaimed neo-Nazi and purchasing new firearms and ammunition, purportedly for "self-defense."

In seemingly accepting Russell's proffer about why he should be released, the Magistrate Judge noted that Russell's father is a deputy sheriff and Russell is a member of the Florida National Guard.  But the United States submits that these factors cut the other way—Russell's training in the National Guard assists him in fulfilling his neo-Nazi mission; indeed, instead of reporting to his Reserves drill duties on Saturday, May 20, 2017, he fled and took his military camouflage and combat boots with him, which were found in his vehicle at the time of his arrest.  (As far as other employment, Russell had recently secured a job at a local firearm store, but had not yet started working there).  Further, despite telling police that he intended to visit his deputy

sheriff father after the murders, Russell's actions showed no such intentions. Despite his father being a deputy sheriff, Russell is an almost 22-year old, self-proclaimed neo-Nazi who kept a framed picture of Timothy McVeigh, not his father, on his bedroom dresser. Indeed, Russell told the court at the bond hearing that he did not have a good relationship with his father.

Other factors, which weigh in favor of detention, include the fact that Russell has no significant ties to this district—his residential ties to Tampa are recent, and his ties to his grandmother in Orlando are speculative at best based on the proffer by the defense; his grandmother told the court that she was not aware of Russell's neo-Nazi views. Further, absent from the court's release order is any consideration that Russell has significant ties to the Bahamas; his mother and sibling live there, and he has frequently traveled there. In fact, Russell's mother was present at the bond hearing and acknowledged his connections to the Bahamas. These foreign resources and ties demonstrate that Russell has the means and ability to flee.

As to both this factor and his dangerousness, Russell has proffered statements from his family that he represents no real threat to harm others, and both his mother (who lives in the Bahamas) and his grandmother (who lives in Orlando) have offered either financial surety and/or to serve as a custodian. These descriptions of Russell, all of which are notably devoid of

any information about the offense conduct, are insufficient to overcome the facts weighing in favor of detention.

Only one aspect of Russell's history and characteristics seems to weigh in favor of release, which is his lack of criminal history. However, lack of criminal history is just one of many factors to be considered, and it alone is not dispositive. *See United States v. Rodriguez*, 950 F.2d 85, 88-89 (2d Cir. 1991) (rejecting notion that government must present a record of violence or dangerous conduct to justify pre-trial detention on dangerousness grounds and noting that "[a]lthough a prior record of violence eases the government's burden of showing dangerousness, it is not essential"). *Cf. Stone*, 608 F.3d at 950 (noting that "courts have never required a prior criminal record before ordering detention").

Even conditions such as a secured bond, electronic monitoring, and home incarceration cannot overcome other factors that weigh in favor of detention in this case. *See United States v. Millan*, 4 F.3d 1038, 1049 (2d Cir. 1993) (internal quotation marks and citation omitted) ("Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.").

These essential characteristics of the defendant, when combined with the other factors set forth at the detention hearing and in this motion,

significantly outweigh the fact that he has no prior criminal history.  This factor also favors detention.

### D.   The Nature and Seriousness of the Danger to any Person or the Community

As demonstrated by the events of May 19 and 20, 2017, Russell's release poses a significant risk of serious harm any other person and to the community.  The evidence proffered by the United States clearly and convincingly demonstrates Russell's willingness to set aside any concern for or allegiance to his community, or country, in favor of  his neo-Nazi, white supremacist beliefs.  Put simply, by manufacturing and storing highly volatile and dangerous explosives in his residence, Russell showed not an ounce of concern for his own life, his roommates' lives, or his neighbors' lives.  As put by one court considering a similar issue,

> [f]ew activities are more dangerous to life and property than the manufacturing and storage of explosive devices in a residential area. It was the manufacturing and possession of these devices that constituted the danger: detonation could have occurred unintentionally in the immediate area of other persons thereby causing serious injury to them.

*United States v. Miftakhov*, No. 3:14-mj-8, 2014 WL 808818, at *4 (W.D. Pa. Feb. 28, 2014) (detention determination in a case charging Title 26 offenses). This weighs heavily in favor of a finding of dangerousness.

During the detention hearing, Russell argued that he was fully cooperative with the police, has no prior arrests or criminal history, and

represents no real threat to harm others.  The court seemed to accept that
Russell presently poses no specific danger to the community, despite the fact
that Russell did not dispute that he is the leader of a self-proclaimed neo-Nazi
organization characterized by the Southern Poverty Law Center as a hate
group.  Russell's argument also ignores that the government is not required to
present evidence that Russell has already harmed someone in order to show
that he is a danger to the community.  Rather, the danger posed by Russell is
demonstrated by Russell's conduct up through the time of his arrest.  An
individual dealing in homemade explosives, especially where there is evidence
of nefarious purposes associated with that, poses a danger to the community
far greater than that posed by most, if not the vast majority, of defendants who
are routinely detained based on far less severe criminal conduct.  *See, e.g.,*
*Stone*, 608 F.3d at 947 & n.6 (reversing a district court's decision to release
several defendants involved in a "seditious conspiracy" partly on the basis of
the nature of the charges, noting that "run-of-the mill drug dealers" are
routinely detained, "even without any indication that the defendant has
engaged in violence").

### E.    Risk of Flight

Russell should be detained based on the Section 3142(g) factors and
dangerousness to the community alone.  But as shown above, he is also a risk

of flight.  Instead of staying in the Middle District of Florida to cooperate with the police after his two roommates and friends were brutally murdered, allegedly with a firearm belonging to Russell, Russell left town and went to another neo-Nazi friend's house with his military camoflauge and combat boots.  After Russell told his other neo-Nazi friend the story about the murders, the friend packed his clothes, his life savings of $3,000, and quit his job on the way out of town because he did not know if he would be returning home.  They left the district and Russell was later arrested after being found in the Southern District of Florida.  On the way to South Florida, the pair stopped at a sporting goods store where Russell bought two long guns and over 500 rounds of ammunition.  Russell loaded the magazines.  Then instead of going to visit Russell's father, the pair stayed in a hotel and headed for the Keys the following morning.

Russell's grandmother in Orlando is not familiar enough with Russell to know his neo-Nazi beliefs and activities.  She travels regularly to the Bahamas to visit Russell's mother.  Russell has also regularly traveled to the Bahamas.

Unlike most cases where flight is hypothetical, Russell has already shown that he poses a risk of flight and has significant ties outside the country. He should be detained pending trial.

## IV.   Conclusion

The factors set forth in 18 U.S.C. § 3142(g) establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community and strongly favor Russell's detention.  Further, Russell's actions in the aftermath of the events of May 19 and 20, 2017, strenuously call into question whether any conditions of release can reasonably assure his appearance.

Because Russell's future appearance and the safety of the community can only be reasonably assured by his continued pretrial detention, the United States requests that this Court revoke the release order.  Additionally, the government requests that this Court stay the release order as necessary for this Court's consideration of this motion.

Respectfully submitted,

W. STEPHEN MULDROW
Acting United States Attorney

By:   *s/ Josephine W. Thomas*
      Josephine W. Thomas
      Assistant United States Attorney
      Florida Bar No. 31435
      400 N. Tampa St., Ste. 3200
      Tampa, Florida 33602
      Telephone:   (813) 274-6000
      Facsimile:   (813) 274-6178
      E-mail:      Josie.Thomas@usdoj.gov

**U.S. v. BRANDON CLINT RUSSELL**          **Case No. 8:17-cr-283-T-24JSS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 12, 2017, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following:

        Ian Goldstein, Esq.

        <u>*s/ Josephine W. Thomas*</u>
        Josephine W. Thomas
        Assistant United States Attorney
        Florida Bar No. 31435
        400 N. Tampa St., Ste. 3200
        Tampa, Florida 33602
        Telephone:   (813) 274-6000
        Facsimile:   (813) 274-6178
        E-mail:        Josie.Thomas@usdoj.gov