UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                  CASE NO. 8:17-CR-283-T-24JSS

BRANDON RUSSELL,

        Defendant.

_____/

## MOTION TO PRECLUDE RELEASE OF
## VIDEO EXHIBITS FROM DETENTION HEARING

COMES NOW the the Defendant, BRANDON RUSSELL, by and through his undersigned counsel, who would hereby move this Honorable Court to preclude the release of the video clips played by the Government during the detention hearing before this Court on June 13, 2017 to the media or any other party, and in support thereof would show as follows:

    1.    On June 13, 2017, during a continuation of the detention and bond hearings in this matter, the Government introduced into evidence, over defense objection, seven (7) video clips of a law enforcement interview of Devon Arthurs. This recorded interview was conducted on the evening of Mr. Arthurs' arrest. Mr. Arthurs was not present for the detention hearing, and counsel had no opportunity to cross examine him. Over the defendant's objections, the video clips were entered into evidence for the purpose of assisting the Court in making a determination as to the issue of risk of danger. There is no question that the video clips in question are hearsay, and would not be admissible at trial. The defendant is requesting the Court to consider these issues in determining whether the video recordings should be released to the public (i.e. the media) to be broadcasted on the news. Defendant would ask the Court to take judicial notice of

1

the fact that this case has already received, and likely will continue to receive extensive media attention, both locally and nationwide. Whatever the news media is able to broadcast will be widely accesible to, and viewed by a large portion of the prostective jury pool.

2. The media has already had extensive and meaningful access to the recordings in question, both when they were played in open court at the detention hearing, as well as privately, the next day, within the Clerk's office. They media obviously scoured over every word of the videos, as almost all pertinent clips have been quoted, *ver batim*, in countless news stories both in print, on television, as well as online. The public, through the media, has had <u>full access</u> to the contents of the Devon Arthur recordings.

3. During the portions of the video played for the court, Mr. Arthurs continuiously attempts to justify his actions in murdering his two (2) friends by accusing the victims and the defendant, Brandon Russell, of a litany of unproven and wholly uncorroborated criminal behavior. Among the allegations made by Arthurs during these video recordings are the following:

   a. Russell studied how to build nuclear weapons in school and is "somebody that literally has knowledge of how to build a nuclear bomb."
   b. Russell and his roommates had a plan to blow up power lines along Alligator Alley, the stretch of Interstate 75 linking Naples with Fort Lauderdale.
   c. They had a plan to fire mortars loaded with nuclear material into the cooling units of a nuclear power plant near Miami.
   d. He said the damage would cause "a massive reactor failure" and spread "irradiated water" throughout the ocean. "Think about a BP oil spill, except it wipes out parts of the eastern seaboard," Arthurs said.

Arthurs is an admitted double murderer, who made extremely inflammatory, inaccurate, and purely fabricated allegations about the defendant, Brandon Russell in said video clips. At the time of his arrest, Brandon Russell was in possession of **none** of the items necessary to effectuate an attack on the nuclear power plant near Turkey Point, as Arthurs alleged. Moreover, such items were not even found during the search of Brandon's Russell's residence. Arthurs' allegations about an alleged attack on a nuclear power facility are fantasy and fabrication. Unfortunately for the defendant, the public has already read and heard about these allegations. This will no doubt create issues when it comes time to selecting a jury of impartial citizens to sit in judgment of Mr. Russell. To allow the actual video recordings to be released, replayed in the media, and available online for individuals to pass around the internet in a viral manner would serve to severly impede justice and prevent the defendant from receiving a fair trial as to the allegations charged in the Indictment in the case at bar. <u>Of note, none of the grandeous and fantastical allegations levied by Arthurs during his interrogation bear in any way on the issue of guilt as to the charges in this case</u>. If the recordings themselves are released, the general public will literally be inundated with the graphic details of the prejudicial delusions of Devon Arthurs. This can serve no purpose other than to deprive Brandon Russell (and perhaps Arthurs himself) of the right to a fair trial. Trial is currently set less than two months away, enhancing the likelihood that the release of the recordings at this time will serve to deprive Brandon Russell of his constitutional right to a fair trial in a court of law; not the media.

    4.    Once released, there is no remedy which could undo the harm caused to the defendant. Converseley, there is no harm to either the media or the public in delaying the release of the video reconndings until after Mr. Russell's trial. As stated above, both the media and the public have had extensive access to each and every word contained in the recordings admitted

into evidence at the detention hearing.

## MEMORANDUM OF LAW

This issue is not novel, and has been addressed many times over the last forty years. While the media's rights have been vigorously upheld when it comes to the disclosure of pertinent case information, the media's rights to the actual video clips at issue are in no way absolute.

In <u>Nixon v. Warner Communications Inc.</u>, 435 U.S. 589 (1978), the Supreme Court addressed this issue in great detail. The Court's ruling on this issue is both relevant and instructive given the circumstances of the case at bar. In <u>Nixon</u>, the court stated:

> The First Amendment generally grants the press no right to information about a trial superior to that of the general public. "Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public." *Estes v. Texas*, 381 U.S. 532, 589, 85 S.Ct. 1628, 1663, 14 L.Ed.2d 543 (1965) *610 Harlan, J., concurring). Cf. *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). See also *Zemel v. Rusk*, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1280–1281, 14 L.Ed.2d 179 (1965). **Respondents contend** that **release** of the **tapes** is **required** by the **Sixth Amendment guarantee** of a **public trial**. They acknowledge that the trial at which these tapes were played was one of the most publicized in history, but argue that public understanding of it remains incomplete in the absence of the ability to listen to the tapes and form judgments as to their meaning based on inflection and emphasis.

The Court went on to state that:

> In the first place, this argument proves too much. The same could be said of the testimony of a live witness, yet there is no constitutional right to have such testimony recorded and broadcast. *Estes v. Texas, supra*, 381 U.S., at 539–542, 85 S.Ct., at 1631–1632. Second, while the guarantee of a public trial, in the words of

> Mr. Justice Black, is "a safeguard against any attempt to employ our courts as instruments of persecution," *In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948), it confers no special benefit on the press. *Estes v. Texas*, 381 U.S., at 583, 85 S.Ct., at 1653 (Warren, C. J., concurring); *id.*, at 588–589, 85 S.Ct., at 1662–1663 (Harlan, J., concurring). Nor does the Sixth Amendment require that the trial—or any part of it—be broadcast live or on tape to the public. The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed. *Ibid.* That opportunity abundantly existed here.  Id. (holding that **"the Court of Appeals erred in reversing the District Court's decision not to release the tapes in its custody."**)  (Emphasis added).

While the matter at issue concerns a detention hearing, the same principles of law apply. This is expecially true given the fact that the detention hearing in this matter was extensive and in many ways similar to a trial.  The requirements of a public hearing have been more than satisfied; and to go any further would serve only to prejudice the defendant and deprive him of his constitutional right to a fair trial.

## CONCLUSION

In the case at bar, the rights of the public and the media have been satisfied by the access already provided, both in open court as well as in the clerk's office within the courthouse. Dissemination of the actual video clips will serve to seriously and irreparably damage the defendant's ability to receive a fair and impartial trial.

WHEREFORE, based upon the foregoing, the defendant opposes the release of the video clip exhibits referenced above, and would respectfully move this Honorable Court to enter an Order precluding their release until after trial in this matter.

## CERTIFICATE OF SERVICE AND FILING

I HEREBY CERTIFY that the foregoing has been electronically filed and served on all parties via CM/ECF on the 16th day of June, 2017.

GOLDSTEIN & JETTE,  P.A.
Attorneys for Defendant Brandon Russell
500 South Australian Avenue, Ste. 720
West Palm Beach, Florida 33401
Tel: (561) 659-0202
Email: ijg@goldsteinjette.com

*/s/ Ian J. Goldstein*
IAN J. GOLDSTEIN
Fla. Bar. No. 0085219