**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                              Case No. 8:17-cr-283-T-24JSS

BRANDON CLINT RUSSELL,

       Defendant.
_____/

**TIMES PUBLISHING COMPANY'S MOTION TO INTERVENE AND
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO SEAL
VIDEO CLIP EXHIBITS FROM PRETRIAL DETENTION PROCEEDINGS**

TIMES PUBLISHING COMPANY ("the Times"), publisher of the daily newspaper the *Tampa Bay Times* (formerly the *St. Petersburg Times*) by and through its undersigned counsel, moves to intervene and be heard on the issue of access to judicial records. This Memorandum of Law is filed pursuant to permission of the Court given at the June 14, 2017 hearing on the Defendant's Motion to Seal Video Clip Exhibits from Pretrial Detention Proceedings.

**1.   The Times has standing to intervene and be heard.**

Because of the few-hour window between the Defendant's filing of his Motion to Seal and the Court's hearing on the motion on June 14, 2017, the Times was unable to file a formal Motion to Intervene. The Times thanks the Court for allowing counsel to speak at the hearing in absence of a written motion and now asks the Court to enter an order permitting the Times' limited intervention for purposes of opposing limitations on the news media's and the public's rights of access to judicial records. The Times has standing to intervene to be heard on issues affecting these rights. *See U.S. v. Valenti*, 987 F.2d 708 (11th Cir. 1993).

1

### 2. The judicial records at issue are clothed with a strong presumption of openness.

Over the past 37 years, few areas of First Amendment law have advanced more steadily and thoroughly than that establishing rights of public access to the criminal justice process.

Beginning with *Richmond Newspapers v. Virginia,* 448 U.S. 555 (1980)(holding First Amendment protects right of public access to criminal trials), and continuing through *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982)(statute excluding press and public from courtroom during testimony of minor sex crime victim violated First Amendment), *Press-Enterprise Co. v. Superior Court ("Press Enterprise I")*, 464 U.S. 501 (1984)(First Amendment protects public right of access to jury selection even where closure urged to protect potential jurors' privacy), and *Press-Enterprise Co. v. Superior Court ("Press-Enterprise II")*, 478 U.S. 1 (1986)(First Amendment protects right of access to California 41-day pretrial evidentiary hearing even where closure urged to protect defendant's fair trial rights), the United States Supreme Court has repeatedly recognized that transparency of the criminal justice system serves the most compelling of this Nation's interests and values, and distinguishes the United States' criminal justice system from those of non-democratic, authoritarian regimes. "Openness enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise I*, 464 U.S. at 508.

The lower courts have also steadily advanced the law, and systemic transparency, finding First Amendment rights of access attach to the full array of proceedings involved in a criminal prosecution, from detention hearings to sentencing and post-sentencing matters. *See, e.g., Seattle Times Co. v. United States District Court for the Western District of Washington*, 845 F.2d 1513 (9th Cir. 1988)(defendant's right to fair trial did not override newspapers' First Amendment right of access to documents related to pretrial release); *In re Hearst Newspapers, L.L.C.*, 641 F.3d

168 (5th Cir. 2011)(First Amendment right of access to sentencing proceedings); *United States v. Ellis,* 90 F.3d 447 (11th Cir. 1996)(constitutional right of access extends to post trial proceedings, including transcript of hearing concerning fees and costs paid to retained counsel).

Echoing throughout the courts' opinions are the weighty systemic values underlying the Nation's commitment to openness and public access, especially with regard to criminal prosecutions. Specifically with regard to documents related to a pretrial detention hearing and decision, the Ninth Circuit explained in *Seattle Times Co. v. U.S. District Court for the Western District of Washington,* 845 F.2d 1513:

> Public interest in the conditions of pretrial release is understandably great because the community is directly affected. [] Also, this court has noted: "pretrial documents, such as those dealing with the question whether [the defendant] should be incarcerated prior to trial … are often important to a full understanding of the way in which the judicial process and the government as a whole are functioning." []
>
> Moreover, pretrial release decisions benefit from public scrutiny. The decision to hold a person presumed innocent of any crime without bail is one of major importance to the administration of justice. [] Openness of the proceedings will help to ensure this important decision is properly reached and enhance public confidence in the process and the result.

*Seattle Times*, 845 F.2d at 1516-17 (internal citations omitted). The court especially noted the Supreme Court's admonition in *United States v. Salerno*, 481 U.S. 739 (1987), that "liberty is the norm and pretrial detention is a 'carefully limited exception.'"

Under the standard established by the United States Supreme Court, the First Amendment right of access to criminal proceedings cannot be abrogated, and closure ordered, "unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press Enterprise II*, at 13-14. "If

the interest asserted is the right of the accused to a fair trial, the preliminary hearing shall be closed only if the specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights. *Press Enterprise II*, at 14.

While the Eleventh Circuit does not appear to have had an occasion to opine specifically on public access rights to detention hearings or evidence admitted during them, the Eleventh Circuit has applied the *Press-Enterprise II* test (or a slight variant) to closures of judicial proceedings <u>and</u> judicial records. *See, e.g., United States v. Valenti,* 987 F.2d 708, 715 (11th Cir. 1993)(invalidating Middle District's system of failing to publicly docket sealed filings, which "effectively preclude[ed] the public and the press from seeking to exercise their constitutional right of access to transcripts of closed bench conferences" and was "unconstitutional infringement on the public and press's qualified right of access to criminal proceedings"). *See also Brown Advantage,* 960 F.2d 1013, 1015-16 (1992)(applying First Amendment "compelling interest" standard to determine whether petitioner had right of access to judicial records submitted openly but subsequently sealed).

Our district courts have differed as to whether the right of access derives from the First Amendment or common law. *See United States v. Shenberg,* 817 F.Supp. 118 (S.D. Fla.1993)(rejecting constitutional right of access to audio and video tapes admitted at trial, but finding common law right and ordering copies be provided to the press at conclusion of trial); *United States v. Posner*, 594 F.Supp. 930 (S.D. Fla. 1984)(holding First Amendment right of access applied to defendant's tax returns admitted into evidence at co-defendant's trial; noting

that Eleventh Circuit did not have to reach the issue in its then-recent judicial records decision, because it found strong common law right applied).

However, this Court need not decide the Defendant's Motion here by declaring or rejecting a First Amendment right to examine and copy the judicial records at issue. This Court need only to adhere to balancing the interests asserted under the facts and circumstances of this case, observing the well-established principle that judicial records in criminal cases are, without question, subject to a common law right of access, and thus clothed with a presumption favoring openness, a heavy burden to defeat.

"Access to records" <u>normally</u> includes the ability of the public to obtain copies – witness the enormous popularity of PACER, and the usual ease with which the news media obtain copies of documentary evidence admitted during trials. And the Eleventh Circuit has specifically addressed the right to copy as a normal adjunct of the right of access.

In a still-leading authority, *Newman v. Graddick*, 696 F.2d 796 (11th Cir. 1983), media inspection <u>and copying</u> of court-ordered lists of prison inmates eligible for release was at issue in the Alabama prison overcrowding litigation. The Eleventh Circuit drew heavily on the teaching and values articulated in *Richmond Newspapers* and *Globe Newspaper Co.*, holding that "'[w]here, as in the present case, the [court] attempts to deny access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to that interest.'" *Newman,* 696 F.2d at 802, quoting *Globe Newspaper Co.,* 457 U.S. at 606-07. "The [court] proceedings were decisional as to which prisoners were to be released. The integrity of the judicial process, which public scrutiny is supposed to safeguard, is just as much at issue in proceedings of this kind as at a trial." *Newman*, 696 F.2d at 801.

The court acknowledged that, based on *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978), "there may be no constitutional right to copy." It emphasized, however, that *Nixon* did recognize a common law right <u>to inspect and copy</u> judicial records, that the right is "historic," creates a presumption favoring this access, and "is important if the public is to appreciate fully the often significant events at issue in public litigation and the workings of the legal system." *Newman,* 696 F.2d at 802-03. The courts certainly have "discretion" to strike the balance in each case where access is challenged, with articulated findings supporting each decision.  The court noted that *Nixon* suggested some factors for consideration where a request to copy tapes is at issue: "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents of the records." *See Newman*, 696 F.2d at 803. The *Newman* court distinguished from its circumstances the case of *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423 (5th Cir. 1981), where the court affirmed a denial to the media of copies of audiotapes admitted into evidence at a trial, based on concern for yet-to-be-tried defendant's fair trial rights.

Access jurisprudence has advanced since *Nixon* in 1978 and *Belo* in 1981. Florida district courts have, subsequent to *Belo,* weighed the same argument – fair trial rights – and have allowed the news media to obtain copies of the records at issue in their cases in advance of trial. *See United States v. Noriega,* 752 F. Supp. 1037, 1044 (S.D. Fla. 1990)(releasing copies of transcripts of famous foreign dictator's telephone conversations from Miami jail; "Yet, if this court's actions in this highly-publicized matter are to be accorded any meaningful public scrutiny, then the public should have access to *all* of the contents of the transcripts which formed

the basis for the court's ruling)(emphasis in original); *Posner,* 594 F. Supp. 930 (releasing tax returns admitted in evidence at co-defendant's trial). *See also United States v. Hernandez*, 124 F.Supp.2d 698, 705 (S.D. Fla. 2000)(granting media's mid-trial emergency motion for access to admitted evidence and right to make copies; finding "Defendants' foreshadowing of a 'hostile, prejudicial environment resulting from the media's access to the evidence too speculative, at this point").

While the Ninth Circuit in *Seattle Times* articulated a clearly First-Amendment-based, multi-part test in more detail than has the Eleventh Circuit, our courts' decisions demonstrate the same respect for public access rights and disinclination to curtail them even where fair trial rights are raised as the reason.

### 3. This Court should allow continued access to, and copies of, the video clip evidence.

On Tuesday of this week, defense counsel publicly cast doubt on the evidence at issue on the grounds that Devon Arthurs is "desperate to save himself" and "a few cards short of a full deck. … He's insane."[1] On Wednesday at the hearing, counsel emphasized the inflammatory but <u>uncorroborated</u> nature of Arthurs's story, and the fact that the clips did not provide any first-hand account of actual criminal activity by Defendant Russell. Yet, the Defendant asks the Court to <u>"to seal"</u> the video clip exhibits on the ground that they will "interfere with" his ability to receive a fair trial. It is <u>unclear</u> whether the Defendant seeks an order ending the news media and public's ability to view the exhibits in the Clerk's Office, or whether he seeks only to keep them from obtaining copies. The news media urge this Court to refrain from limiting the public's access to this evidence either by sealing the exhibits or by prohibiting the news media from

---

[1] http://www.tampabay.com/news/courts/criminal/judge-sets-release-conditions-for-neo-nazi-in-tampa-palms-explosives-case/2327088

obtaining copies of the exhibits for examination and publication. The evidence is central to a critical decision of the Court.

On Wednesday, June 14, 2017, this Court entered its Order of Detention (Doc. 18). The Order shows the video clips at issue were "decisional." *See Newman v. Graddick,* 696 F.2d 796. At present, only the Court and the people who were able to be present in court when the tapes were played were able to observe the evidence. At present, the Court is contemplating whether to limit that opportunity only to the people who can travel to the Clerk's office during the Clerk's business hours, or perhaps to foreclose access entirely. Given the significance of the Court's decision to detain a citizen who is presumed innocent, and the systemic and case-specific values supporting unrestricted access to this key evidence, the Court should permit the public the broadest opportunity to view what the Court viewed, by allowing the news media and public to obtain copies.

4. **The Court should not prohibit the news media from obtaining copies of the records based on "prejudicial pretrial publicity" arguments.**

Researchers who have studied the effect of publicity created by open pretrial hearings have concluded there is insufficient evidence to conclude a causal relationship exists between the news coverage and juror bias. "Absent satisfying the causation requirement by showing a strong link between potential jurors and media publicity resulting from the [pretrial] hearing, the proponent of closure cannot overcome the presumption of openness. Nothing in the recent empirical studies provides any basis for this link. Robb M. Jones, *The Latest Empirical Studies on Pretrial Publicity, Jury Bias, and Judicial Remedies, Not Enough to Overcome the First Amendment Right of Access to Pretrial Hearings*, 40 Am. U. L. Rev. 841, 845 (1991).

As mentioned above, the United States Supreme Court established that the California-style preliminary evidentiary hearing – a mini-trial – was required to be open, even though it

8

certainly would occasion prejudicial pretrial publicity, since its purpose was to require the government to present its evidence of the defendant's guilt. Bare assertions of "fair trial rights" do not support closure. The assertions here are just that, bare, and speculative.

"Pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Nebraska Press Assn v. Stuart,* 427 U.S. 539, 554 (1976). "Prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance.*" *Skilling v. United States*, 561 U.S. 358, 381 (2010), citing *Irvin v. Dowd,* 366 U.S. 717, 722 (1961)(jurors not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case").

*Skilling* was the criminal prosecution of a notorious Enron executive whose crimes had widespread community impact, in part because of the Enron corporation's "sheer number of victims." Noting the size and diversity of the jury pool available in Houston, and other factors, the Court held that Skilling's fair trial rights had not been compromised by pretrial publicity, even given its "magnitude" and negativity.  *See also Seattle Times Co.,* 845 F.2d at 1517-18 (rejecting assertion of fair trial rights as grounds for sealing detention-decision-related documents; Seattle is large metropolitan area, length of time between unsealing and trial would minimize impact). (The documents at issue in *Seattle Times* were the defendant's financial affidavit, and the parties' legal briefs' descriptions of the facts and evidence in the case where defendant was accused of killing two people with cyanide she placed in Excedrin capsules).

Instructive also on the exact issue presented is the Second Circuit's decision in *United States v. Graham,* 257 F.3d 143 (2d Cir. 2001). At issue was the request of two television stations for audio and videotapes on which the court had relied to detain two defendants charged

with drug trafficking. Finding a common law right to inspect <u>and copy</u> the evidence, the court affirmed the district court's decision to release copies of the tapes for possible broadcast, even in the face of claims by the defendants that their fair trial rights would be affected.

Of course, this Court must consider and must protect this Defendant's rights to a fair trial, and be cognizant of those of Mr. Arthurs, in deciding whether to curtail or prohibit access to hearings or to records. The Court bears that obligation whether public access to the material at issue is protected by the First Amendment or the common law. However, here, any trial of either this case or the State of Florida's case against Devon Arthurs is necessarily a long time away. Publicity occasioned by the release of copies of the video clip evidence will have plenty of time to dissipate. Moreover, as the Court surely knows from experience, the sheer amount of violent and frightening criminal behavior in the Tampa Bay area, in Florida, and in our Nation, tends to dampen the public's ability to retain in mind details of any particular case from week-to-week, as the next horrific criminal event supersedes the last in the public's attention.

In conclusion, the Court is holding a presumed-innocent citizen based in significant part on uncorroborated evidence provided by Mr. Arthurs, who the Court called "a troubled individual," possessed of a "rambling and disjointed mind set" who attempted to "rationalize or justify his unconscionable killing of two people" in part by "deflect[ing] law enforcement's attentions away from himself and toward Defendant." (Doc. 18, at 2). His credibility merited "close scrutiny." (*Id.*). The lack of corroboration "troubled" the Court. (*Id.*). Times Publishing Company, on behalf of itself and other similarly situated media members, and on behalf of the public, asks that this Court allow them continued meaningful access, and also to obtain copies of, the video exhibits admitted in evidence at the Defendant's detention hearing so that the values underlying both the First Amendment and common law rights of public access are served -- that

is, free and fully informed scrutiny and discussion of the Court's decision and the Government's handling of this case.

If the Court decides to prohibit copying, the Times asks that the Court at least allow transcripts of these materials be made available.

WHEREFORE, the Times Publishing Company respectfully requests that this Honorable Court enter its order granting the Times leave to intervene to be heard on issues affecting public access to judicial records, and further respectfully requests that the Court deny the Defendant's Motion to Seal.

Respectfully submitted,

*/s/ Alison M. Steele*
Alison M. Steele
Fla. Bar No. 701106
ALISON M. STEELE, P.A.
146 Second Street North, Suite 310
St. Petersburg, FL 33701
Telephone: (727) 849-6400
Email: amnestee@aol.com

Counsel for Times Publishing Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of June, 2017, the foregoing has been electronically filed with the Clerk of Court via CM/ECF, which will send notice of the electronic filing to: Ian J. Goldstein, Esq., 500 South Australian Ave., Suite 720, West Palm Beach, FL 33401, ijg@goldsteinjette.com; Daniel George, Esq., U.S. Attorney's Office, 400 N. Tampa St., Suite 3200, Tampa, FL 33602-4798, daniel.george@usdoj.gov; and Josephine W. Thomas, Esq.,

U.S. Attorney's Office, 400 N. Tampa St., Suite 3200, Tampa, FL 33602-4798,

Josie.Thomas@usdoj.gov.

                                              */s/ Alison M. Steele*_____
                                              Alison M. Steele
                                              Fla. Bar No. 701106