UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                          CASE NO. 8:17-cr-283-T-24JSS

BRANDON CLINT RUSSELL

**UNITED STATES' MOTION FOR UPWARD DEPARTURE AND/OR UPWARD VARIANCE AND SENTENCING MEMORANDUM**

The United States of America moves for an upward departure and/or variance from the advisory guidelines range in this case, and requests that this Court sentence the defendant, Brandon Clint Russell, to the statutory maximum term of imprisonment allowable for the crimes to which he pleaded guilty—eleven years. In support of such request, the United States files this Sentencing Memorandum and states as follows:

## I. Factual Background

Around 5:30 p.m. on Friday, May 19, 2017, 18-year-old Devon Arthurs walked into a smoke shop in Tampa Palms wielding a gun and told employees he had just killed two people. After Tampa Police Department Officers arrived and took him into custody, Arthurs led them to an apartment leased by Russell and told officers where to find the bodies of 22-year-old J.H. and 18-

year-old A.O. Arthurs had shot and killed two of his roommates for allegedly disrespecting and teasing him over his recent conversion to Islam.[1]

Upon arriving at the murder scene, officers encountered Russell, Arthurs' other roommate and longtime friend, standing outside the apartment in his Army National Guard uniform. Russell had returned home from his Reserve duties and was visibly upset after having found the victims' bodies. Arthurs told police that Russell knew nothing about the murders.

In a post-*Miranda*, recorded interview, Arthurs told officers that he, Russell, and the two victims had shared a common neo-Nazi belief until Arthurs recently converted to Islam. Arthurs advised that Russell and the victims were active members of the "Atom Waffen" group, a neo-Nazi group started and led by Russell. Arthurs informed officers that he had seen Russell online in various neo-Nazi chat rooms, where Russell threatened to kill people and bomb infrastructure. Arthurs further advised that Russell had materials in the house to kill civilians and target locations like power lines, nuclear reactors, and synagogues.

A state-court authorized search warrant was executed at the apartment. In the garage, agents found a cooler containing a white cake-like substance that two FBI and TPD bomb technicians immediately recognized through

---

[1] Arthurs has been charged with the homicides by the State of Florida; that case is currently pending.

their training and experience as the highly volatile explosive Hexamethylene Triperoxide Diamine (HMTD). Within a short distance of the HMTD were explosive precursors such as potassium chlorate, potassium nitrate, several pounds of ammonium nitrate (a blasting agent that was in a package addressed to Russell), nitro methane, hexamine, and citric acid. Also within a short distance of the HMTD were empty 5.56 caliber shell casings with fuses and electric matches, both of which could be used to detonate a destructive device.

In Russell's bedroom, officers found neo-Nazi and white supremacist propaganda, including a framed picture of Timothy McVeigh on his dresser, firearms, and ammunition. In the second bedroom, where the victims had been living and were found, officers found a blue duffel bag in the closet containing hobby-like fuses like the ones found in the empty 5.56 caliber ammunition casings in the garage, a written recipe for explosives, petroleum jelly, and five recordable compact discs.[2]

The night of the murders, Russell voluntarily spoke with law enforcement. He admitted to making the HMTD found in the garage. He claimed that he had been a member of an engineering club at the University of South Florida and that the HMTD was for setting off model rockets and

---

[2] The United States intends to enter photographic evidence of the crime scene at the sentencing hearing.

balloons. Notably, officers found nothing in the apartment related to model rockets, and USF officials advised the FBI that at no time did the club use explosive material. Russell further stated he had made the HMTD over a year ago but had not gotten rid of it. He admitted to the possession of the ammonium nitrate and other precursors found in the garage, as well as the electric matches that could be used as initiators. Russell told officers that he just wanted to go to West Palm Beach to see his father.

United States Magistrate Judge Thomas B. McCoun III authorized a criminal complaint for Russell's arrest on May 20, 2017, charging him with possession of an unregistered destructive device and the unlawful storage of explosive material, in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 842(j), respectively. By then, Russell had left the Tampa area, but had not gone to see his father as he had told law enforcement. His family advised law enforcement that they either had not heard from him or did not know his whereabouts.

The following morning, the Monroe County Sheriff's Office arrested Russell while he was inside a restaurant in Key Largo. FBI agents took Russell into custody and advised him of his rights. Russell described coming home and finding his roommates murdered. Russell advised that he had been friends with the victims for about a year. He stated that he and Arthurs had known each other for about three or four years and had met in an online chat room.

When asked what the chat room was about, Russell described it as "about world events" and said that the United States is not the only place that matters in the world.

When asked if there were any homemade explosives in the apartment, Russell nodded. Russell stated that the explosives were used for amateur rockets, which he launched from a field. He admitted to having two guns and ammunition in his car. When asked what he knew of the words "Atom Waffen," Russell ended the interview.

In Russell's vehicle, agents found two rifles in the original manufacturer's boxes: (1) a Savage Arms, 30-06 caliber rifle, and (2) a Smith & Wesson M&P Sport II, 5.56 caliber assault-style rifle. Russell also had two cases of .223 caliber ammunition (about 500 rounds), three boxes of 30-06 caliber ammunition, and four 5.56 x 45mm, 30-round magazines. Each of the four magazines was already loaded with about 25 rounds of the .223 caliber ammunition. Russell also had binoculars, some of his Army camouflage uniforms, combat boots, and a skull mask.

Another individual was with Russell at the time of his arrest and voluntarily spoke with law enforcement. A self-proclaimed fascist, neo-Nazi, and national socialist, this person described meeting Russell online in the forum "Iron March," where individuals discuss fascism, Nazism, and "current

trends" in hate for the government. This individual said that he and Russell shared common viewpoints and that Russell was one of his best friends. The friend stated that Russell had multiple firearms and that they would go to gun shops and gun ranges together. Russell's friend knew Arthurs and the victims, and had planned to move in with the four of them. This friend described "Atom Waffen" as a more exclusive group than Iron March, with approximately thirty members from across the United States. According to Russell's friend, Russell screened members who wanted to join "Atom Waffen," because they did not want people to join who were not committed to their beliefs or who were "complete idiots."

Russell's friend advised that early on May 20, Russell had arrived at the friend's house in Bradenton, Florida, wearing his military uniform. Russell told his friend about the murders and said that he wanted to get away and clear his head. Russell's friend grabbed clothes, his life savings of $3,000, and quit his job on the way out of town. Russell's friend told agents that he thought he might not return home. He thought that he and Russell were initially going to Russell's father's house in West Palm Beach, but as they got closer Russell changed his mind because he thought law enforcement might be looking for him. According to Russell's friend, they had no specific destination in mind and had no plans to hurt anyone or do any harm. As they traveled

south, the pair stopped at a sporting goods store where Russell purchased the firearms and ammunition (allegedly for self-defense).

## II. Procedural History

Russell made his initial appearance in the Southern District of Florida on May 22, 2017. On May 31, 2017, Russell moved this Court to set a bond hearing. (Doc. 8) On June 7, 2017, a grand jury in the Middle District of Florida, Tampa Division, indicted Russell for possessing an unregistered destructive device, in violation of 26 U.S.C. § 5861(d), and the unlawful storage of explosive material, in violation of 18 U.S.C. § 842(j). (Doc. 14)

The Magistrate Judge held a bond hearing on June 8, 2017, and the next day entered an order granting Russell's motion for bond. (Docs. 15, 18) Pursuant to 18 U.S.C. § 3145(a)(1), the United States sought an order revoking the order of release; after an evidentiary hearing,[3] the Court granted the motion and detained Russell pending trial. (Doc. 32)

Without entering into a plea agreement, Russell pleaded guilty on September 27, 2017, to Counts One and Two of the Indictment. (Doc. 58) During the plea hearing, Russell objected to the statement in the United

---

[3] The United States' Amended Motion for an Order Revoking Defendant's Release (Doc. 22), and the exhibits entered by the United States at the detention hearing (Docs. 28 to 28-5), have already been entered into the Court record and are hereby incorporated by reference into this Sentencing Memorandum. The United States intends to refer to a number of these exhibits at the sentencing hearing.

States' Factual Basis that he "intended to assemble a destructive device with the materials he possessed"; the parties agreed that his objection did not affect the factual basis established to support the plea. (Docs. 57, 58) Russell maintains his objection to the Probation Office's inclusion of that statement in his Presentence Investigation Report, but evidence in this case belies his assertion.

### III. Guidelines Calculation and Request for Upward Departure

Based on the charges to which Russell pleaded guilty, Probation has correctly calculated the advisory guidelines range as 24-30 months' imprisonment. Based on the commentary to USSG § 2K2.1 and related policy statements, however, an upward departure is warranted and reasonable in this case.

Destructive devices "pose a considerably greater risk to the public welfare than other National Firearms Act weapons." USSG § 2K2.1, cmt. n.7. The commentary to USSG § 2K2.1 provides that an upward departure may be warranted "[i]n a case in which the cumulative result of the increased base offense level and the enhancement under subsection (b)(3) does not adequately capture the seriousness of the offense because of the type of destructive device involved, the risk to the public welfare, or the risk of death or serious bodily injury that the destructive device created." *Id.*

All of the above factors are present in this case. First, HMTD is a highly volatile and dangerous explosive that even highly trained and skilled bomb technicians are nervous to encounter. Indeed, when recovering or moving HMTD found in a manner like in this case, law enforcement will use a robot because of the danger to human life. Here, Russell's garage was barren of anything other than his mini-lab. In addition to the HMTD, which was in a cooler with the name "Brandon" written on it, agents found bags of explosive precursors such as potassium chlorate, potassium nitrate, several pounds of ammonium nitrate (a blasting agent in a package addressed to Russell), nitro methane, hexamine, and citric acid. Also within a short distance of the HMTD were empty 5.56 caliber shell casings with fuses and electric matches, both of which could be used to detonate a destructive device. According to trained agents, the HMTD combined with the amount of ammonium nitrate and nitro methane found in the garage would create a bomb that could easily cause a vehicle to explode, killing all of the occupants and causing grave damage within a large distance around the explosion site.

Russell knew exactly what he was making in his garage—he admitted to manufacturing the HMTD—and kept his mini-lab directly under his living space. Only a single wall separated the garage from unsuspecting third parties who also lived in the apartment complex. Russell showed not an ounce of

concern for his own life, his roommates' lives, or his neighbor's lives. As put by one court considering a detention issue:

> [f]ew activities are more dangerous to life and property than the manufacturing and storage of explosive devices in a residential area. It was the manufacturing and possession of these devices that constituted the danger: detonation could have occurred unintentionally in the immediate area of other persons thereby causing serious injury to them.

*United States v. Miftakhov*, No. 3:14-mj-8, 2014 WL 808818, at *4 (W.D. Pa. Feb. 28, 2014).

For those reasons, the advisory guidelines range "does not adequately capture the seriousness of the offense because of the type of destructive device involved, the risk to the public welfare, [and] the risk of death or serious bodily injury that the destructive device created." USSG § 2K2.1, cmt. n.7.[4]

### IV. Sentencing Factors under 18 U.S.C. § 3553(a) and Request for Upward Variance

---

[4] Further, Circuit Courts of Appeals, including the Eleventh, have upheld upward departures in destructive device cases, citing factors such as "the indiscriminate and unquietly dangerous propensity" of items that pose a significant safety risk to the public. *See, e.g., United States v. Dempsey*, 957 F.2d 831 (11th Cir. 1992) (upholding an upward departure of more than double the advisory guidelines range); *United States v. Loveday*, 922 F.2d 1411 (9th Cir. 1991) (upholding an upward departure and giving special consideration to the fact that the pipe bombs were homemade and made by amateurs); *United States v. Sewraz*, 255 F. App'x 492 (11th Cir. 2007) (upholding a two-level upward departure based on the risk of injury created by the location of the destructive device); *United States v. Kostich*, 197 F. App'x 753 (10th Cir. 2006) (upholding a two-level upward departure based on potential injury of smoke inhalation);

In the alternative to an upward departure, an upward variance would also be warranted and reasonable under the facts of this case.

Russell admitted in two separate interviews that he made the HMTD found in his residence and that the precursors and other materials that could be used to make a bomb belonged to him. Yet Russell still maintains, despite his guilty plea and other overwhelming evidence of his intent, that he did not intend to assemble a destructive device with these materials. A simple survey of the crime scene, coupled with Russell's own admissions and actions, belies that assertion and demonstrates that Russell fails to accept responsibility for his actions.[5]

The dangerousness of Russell's conduct in this case cannot be understated. With respect to the nature and circumstances of the offense, the United States incorporates by reference the arguments made above in its request for an upward departure. Additionally, however, the evidence of Russell's intent found inside his apartment, his conduct up through the time of his arrest, his lies to law enforcement, and his continued conduct while incarcerated show that Russell's character is that of a person with an ideology that is paired with a call to violence.

---

[5] At sentencing, the government intends to introduce a number of photographs of Russell's apartment as evidence supporting both an upward departure and upward variance in this case. These photographs were provided to the defense in discovery.

Russell's motivation, intent, and the danger that he poses is clear from one look at his bedroom. Russell's bedroom has bare walls, a mattress, a lamp, a dresser, and one single, solitary framed picture on his dresser—Timothy McVeigh, in his military uniform. In Russell's closet, under his own military uniform, is a pile of camouflage military-type gear and clothing, gun cases, several firearms, and ammunition. The "Atomwaffen" name and symbol have been drawn in black marker on some of the gear. In this case, an often-used quote says it best—"a picture is worth a thousand words." Russell had a place of prominence for the picture of his idol, Timothy McVeigh, someone who turned his ideology into violent action. A photographic journey through Russell's apartment—the backdrop of the murder scene—is a chilling confirmation of Russell's intent to follow in the footsteps of his hero.

The first entry into the apartment reveals the prominent placement of the North Korean flag. Nearby, above the dining room table, hangs the Atomwaffen flag. The prominently displayed books on the living room shelves and table include, among others, multiple copies of Hitler's *Mein Kampf*, Musolini's *The Doctrine of Fascism*, *Hammer of the Patriot*, *The Turner Diaries* (the same extremist book that influenced Timothy McVeigh and is known as a "bible" for extremists), Oswald Mosley's *My Life*, *Terrorism in Perspective*, and *World War 2 Waffen SS Solider Stories: Eyewitness accounts from Hitler's Elite WW2*

*Troops*. Notably, peppered amongst these books are others such as *Electronic Formulas, Symbols & Circuits*, *The Elements: A Visual Exploration of Every Known Atom in the Universe*, Oxford's *Dictionary of Science*, *A Field Guide to Radiation*, *U.S. Army Guide to Boobytraps*, *Atomic Physics*, *U.S. Army Improvised Munitions Handbook*, and *A Short History of Nuclear Folly*. A short distance down the hall, in the bedroom where his roommates were murdered, hang a Confederate flag and the flag of the Azov Battalion, a special operations group of the Ukrainian Army which gained notoriety in recent years after being associated with torture and war crimes, as well a large portion of its members having Nazi sympathies and using associated symbols.

Russell has never disputed that he was the leader of a neo-Nazi group, "Atom Waffen," even after his arrest. While Russell has a First Amendment right to his beliefs, the evidence shows that Russell's beliefs cross the line between hateful ideology and hateful ideology that gives rise to violence. Another example of this is that in the aftermath of two of his friends and roommates being murdered by his other roommate and longtime friend, Russell's primary concern was not the victims of the shooting or cooperating with law enforcement, but rather leaving town with another Atom Waffen member and self-proclaimed neo-Nazi.   Russell lied to law enforcement

13

about his intended destination, and once he and his friend left Tampa, they purchased new firearms and ammunition, purportedly for "self-defense."

The fact that Russell lied about going to see his father and was found in Key Largo (at a restaurant and not his final destination), with long rifles and ammunition that he purchased less than 24 hours after being interviewed by the FBI, camouflage gear, and a skull mask, shows the character of someone prepared to follow-through with his violent ideology when called to arms.

Russell's conduct since his arrest also evidences that he still holds tight to these beliefs, and will continue to promote these beliefs and violence once released, contrary to his statements to the Court about self-reflection and that he will never put himself in this position again. In August 2017, before he pleaded guilty, the FBI obtained copies of several letters that Russell intended to be delivered to someone outside the jail, believed to be another Atomwaffen member. In one letter, Russell attached a blurb about a 16-year-old Nazi who in 1962 told a judge, "I don't care HOW long you put me in jail, your Honor, . . . as soon as I get out, I will go right back to fight for my White Race and my America!" Russell also drew a diagram of how to make an explosive, which shows an intention to share his knowledge with others. In a second packet of letters, Russell wrote about being visited in jail by one of the Atomwaffen

members and drew plans for an "Airborne Leaflet Dropping Device," demonstrating Nazi propaganda falling from the sky.[6]

Russell is not someone whose arrest and incarceration has caused him to reflect on his conduct or feel remorse. His conduct in this case posed a grave danger to human life, and he has shown that he will continue to be dangerous once released from incarceration.

For all of these reasons, the advisory guidelines range in this case does not reflect the seriousness of the offense, promote respect for the law, or provide just punishment in this case. Further, only a significant prison sentence will afford specific and general deterrence to Russell and others like who desire to engage in conduct that crosses the line from First Amendment protected speech to hateful ideology that calls for violence. Unfortunately, since Russell's arrest, others who have committed crimes elsewhere have cited an allegiance to Russell's "Atom Waffen" group and its ideology. A guidelines sentence in this case is simply not a deterrent for Russell or anyone engaging in this type of dangerous conduct.

Moreover, Russell is a danger to the community and the public must be protected from him. Russell made the HMTD using commonly available ingredients and clearly has the knowledge, ability, and desire to do so again if

---

[6] The United States will offer Russell's handwritten letters as evidence during the sentencing hearing.

released. The evidence of Russell's violent ideology and his conduct while incarcerated shows that he has tightly held beliefs that he will continue to promote. He repeatedly lied to law enforcement, and both fled and re-armed himself with long-guns and ammunition in the first twenty-four hours of a state and federal investigation. Russell's conduct in this case posed a grave danger to the public, and he will continue to pose that danger once released from incarceration. Sometimes, incapacitation is the only way that an individual can be stopped from committing a serious crime. This is such a case, where Russell must be stripped from the ability to harm the public for as long as possible. *See United States v. Mogel*, 956 F.2d 1555, 1558 n.2 (11th Cir. 1992) ("The penological goals underlying the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation.").

V. **Conclusion**

Based upon the foregoing, the United States respectfully urges this Court to sentence Brandon Clint Russell to the statutory maximum term of imprisonment allowable for the charges to which he pleaded guilty, eleven years. With this defendant, the Court has the opportunity to fashion a sentence that recognizes the seriousness of his actions and intentions and incapacitates him from engaging in this behavior again. Thus, the United

States respectfully asks the Court to craft a sentence severe enough to protect the public from him for the foreseeable future.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By: */s/Josephine W. Thomas*
Josephine W. Thomas
Assistant United States Attorney
Florida Bar No. 31435
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: josie.thomas@usdoj.gov

U.S. v. Russell                                         Case No. 8:17-cr-283-T-24JSS

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Ian J. Goldstein, Esq.
William Wallshein, Esq.

                        By:   */s/Josephine W. Thomas*
                              Josephine W. Thomas
                              Assistant United States Attorney
                              Florida Bar No. 31435
                              400 N. Tampa Street, Suite 3200
                              Tampa, Florida 33602-4798
                              Telephone:  (813) 274-6000
                              Facsimile:   (813) 274-6358
                              E-mail:  josie.thomas@usdoj.gov